Filed 10/21/24  P. v. Breedlove CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B327882 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA096371) |
| v. | |
| DERRICK BREEDLOVE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard M. Goul, Judge.  Reversed, in part, and remanded.

Lori Nakaoka, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Michael J. Wise, Deputy Attorney General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Derrick Breedlove (defendant) of the first degree murder of Richard Vidaurry (Vidaurry), with true findings on allegations the murder was committed for financial gain and for the benefit of a criminal street gang. The trial court sentenced defendant to life in prison without the possibility of parole. We are asked to decide whether substantial evidence supports the murder conviction and the associated true findings on the special circumstance and gang allegations. In addition, we consider whether the trial court erred in denying defendant's motion to bifurcate trial of the gang enhancement and whether the trial court instructed the jury in a manner that would have allowed defendant to be convicted on a now improper theory of implied malice.

## I. BACKGROUND

### A.    *The Murder*

On the morning of May 7, 2013, Ignacio Gonzales (Gonzales) was waiting outside Bowtie Connection, an auto body shop in the City of San Pedro. Gonzales was waiting for victim Vidaurry, who also worked at the shop, to arrive and open the business. Either Vidaurry or John Kennedy (Kennedy), the shop's owner, customarily opened the business at approximately 8:00 a.m. each day.

At 8:20 a.m., Vidaurry drove up in a pick-up truck and parked on the street in front of the shop. The truck belonged to Kennedy, who lent the truck to Vidaurry for a month while the latter's car was being repaired elsewhere. Normally, Kennedy would use the truck to drive to the shop.

2

As Vidaurry was parking, Juan Sanchez (Sanchez) was leaving a market across the street from Bowtie Connection. After Vidaurry exited the truck, both Gonzales and Sanchez saw a man wearing a hoodie-style sweatshirt with the hood up, gloves, and a dust or dentist-style mask approach Vidaurry from behind and shoot him once in the head with a handgun. After Vidaurry fell to the street, Gonzales and Sanchez watched the shooter flee the scene on foot. Immediately after witnessing the shooting, Sanchez called 911.

The coroner determined Vidaurry died at the scene and characterized the gunshot wound to his head as a type that would be "rapidly" or "instantly" fatal. The coroner further determined the fatal gunshot was a "contact" wound, meaning the barrel of the gun was in contact with or in close proximity to the back of Vidaurry's head when the gun was fired.

### B. Investigation of the Murder

Los Angeles Police Department (LAPD) detectives interviewed a number of witnesses to the shooting, including Ryan Yasin (Yasin). On the day of the shooting, he was sweeping the streets and emptying trash cans in the neighborhood. At approximately 7:30 a.m., less than an hour before the shooting, Yasin saw a man sitting at a bus stop near the market across the street from Bowtie Connection. Yasin thought the man looked "suspicious" because he was wearing a black hoodie with the hood up, gloves, and a dust mask. Approximately 40 minutes later, as he was cleaning another street, Yasin saw the same man running "full force" away from the area near the bus stop.

Using witness statements concerning the direction in which the shooter fled, detectives canvassed the area in search of

surveillance camera footage. Using recovered footage, detectives were able to trace the gunman's path from the scene of the shooting. The gunman first ran through a parking lot toward an alley, where the murder weapon was later found in a dumpster, before continuing in a direction toward defendant's apartment. Approximately four minutes after the shooting, the gunman arrived at defendant's apartment, which was located approximately three blocks from where Vidaurry was shot. From video surveillance footage inside defendant's apartment building, police were able to identify the gunman as Kirkpatrick.

That same footage depicted defendant and Kirkpatrick's movements on the day before the shooting and on the day of the murder. The day before, defendant was seen leaving his apartment at 11:38 p.m. and returning with Kirkpatrick at 2:57 a.m. early the next morning (the day of the shooting). Shortly after they arrived at defendant's residence, the two men went back down to the garage and drove out of the apartment building, only to return seven to eight minutes later.

Later, at approximately 7:30 a.m., the apartment building's footage showed Kirkpatrick (wearing a dark hoodie-style sweatshirt, gloves, and a mask) leaving defendant's apartment and exiting the building from an alley door. Shortly after Kirkpatrick departed, surveillance footage showed defendant leave his apartment with a box, exit the building via the alley, and walk around to the front of the building before returning to his apartment. At 8:24 a.m., just minutes after the shooting, Kirkpatrick returned to defendant's apartment building, where defendant let him in and escorted him back to his apartment. Minutes later, at 8:31 a.m., defendant exited his apartment and walked up and down outside the front of his building for

4

approximately 10 minutes; he reentered the building just as a police vehicle slowly drove past. Defendant subsequently re-emerged from his apartment and paced about the building's lobby and an adjacent room; during this period, defendant divided his time between checking his phone and appearing to look out the windows at the street.

After recovering the surveillance footage and identifying defendant and Kirkpatrick, the police also obtained Kirkpatrick's cell phone records. Those records revealed a number of communications with a pre-paid phone with no subscriber information. Based on call records, service providers, and location data derived from cell phone towers, as well as the fact that the prepaid phone never contacted defendant's phone, the police concluded defendant was the prepaid phone's owner/user.[1]

The cellphone records revealed defendant and Kirkpatrick began plotting, approximately three weeks before Vidaurry's death, to commit a gun-related crime. On April 12, 2013,

---

[1] Specifically, on April 13, 2013, defendant, using a cell phone tied to a cellular account in his name, sent a text message to Kirkpatrick's phone advising him that he was "buying a phone to call to you." The prepaid phone's first call, made on April 14, was to Kirkpatrick; the following day, Kirkpatrick began sending text messages to the prepaid phone regarding a planned endeavor. On April 15, 2013, Kirkpatrick texted the same basic message to both the prepaid phone ("when cuz wanna do this[?]") and to defendant's cell phone ("When cuz trying 2 do this business[,] bro[?]"). Similarly, on April 23, 2013, while call location information revealed both the prepaid phone and defendant's cell phone were in South Pasadena, Kirkpatrick texted the prepaid phone and received a response less than two minutes later from defendant's cell phone.

defendant texted Kirkpatrick that "a [s]ituation came up and some money was attached to it [and] I figured I[']d run it by you." Kirkpatrick, who at the time had been recently been released from prison, responded positively: "Fa show[.] [W]hat's da deal[?] I need some cash." A few days later, Kirkpatrick texted defendant, asking when an unidentified "cuz" wanted the job done and "[h]ow much cuz try[ing] to pay me [for] it?" On the evening of April 18-19, defendant, using the prepaid phone, responded, "[$]3000. [H]e just want y[o]u t[o] p[o]p him below da waist a few times but [yo]u d[o] w[ha]t [yo]u g[o]t t[o]." Kirkpatrick responded that he understood and asked whether he would be supplied with a "burner," i.e., a gun. Defendant affirmed Kirkpatrick would be provided with a gun and advised that the target worked a few blocks from defendant and he would do some "homework" on the target and get the target's "r[o]utine." Defendant stated that, in addition to conducting reconnaissance, he would monitor police communications via a "scanner." Defendant also informed Kirkpatrick he would have "da bread" (money) "[o]n hand." In addition, roughly two weeks before the murder, defendant—using the cell phone tied to the account registered to him—texted Kirkpatrick about the results of his reconnaissance efforts to date: "Hey, still on it, cuz ain't been showing up at all, jus[t] left from there. …… [I']m on it, jus[t] timing[,] bro."

On the night before the murder, defendant texted Kirkpatrick to advise when he would leave to go pick him up and bring him back to his apartment; hours later defendant texted Kirkpatrick that he was outside Kirkpatrick's residence in San Bernardino. At 9:30 a.m, on the day of the shooting, shortly before returning to his apartment after a visit to the lobby of the

building, defendant texted Kirkpatrick: "It looks like it is clearing up."

The prepaid phone believed to be used by defendant was not used after the shooting and was not recovered by the police. Kirkpatrick stopped using his cell phone on the day of the shooting.

Through their investigation, detectives also learned that in the days following the shooting, defendant and Kirkpatrick spent significant sums of money. Six days after Vidaurry's death, defendant purchased a Cadillac at an auction.[2] Kirkpatrick also purchased a used Cadillac sedan, a new cell phone, and a gym membership; he also visited a casino.

### C.    Charges and Trial

By information, the Los Angeles County District Attorney charged defendant and Kirkpatrick with special circumstance murder, with the two alleged special circumstances being murder for financial gain and murder by lying in wait (Pen. Code,[3] §§ 187, subd. (a), 190, subds. (a)(1) & (15)). The District Attorney also alleged the murder was committed for the benefit of, at the direction of, and in association with a criminal street gang and that a principal personally and intentionally used and discharged a handgun (§§ 186.22, subd. (b)(1)(C), 12022.53, subds. (b), (c), &

---

[2]    Defendant had been interested in the vehicle prior to the shooting; on May 6, the day before the shooting, defendant shared photos of the automobile with his partner.

[3]    Undesignated statutory references that follow are to the Penal Code.

7

(e)(1)).  The trial court later held a joint trial on the charges, using separate juries for each defendant.

Prior to trial, defendant moved to bifurcate trial of the gang allegation, i.e., have his jury determine the truth of that allegation only after it first determined whether defendant aided and abetted Vidaurry's murder.  Defendant argued bifurcation would eliminate the risk of any prejudice from the introduction of evidence that he was a gang member and committed the crime for the benefit of his gang.

The trial court denied the motion because it found the gang evidence was relevant to the murder charge.  The court explained: "[T]he jurors could reasonably wonder why are these two gentlemen doing this?  How can they trust one another?  Are they lifelong friends?  Are they compatriots of some kind?  Otherwise you have two individuals getting together by happenstance.  They would have to have great trust in each other to engage in a venture like this and trust that the other gentleman is not going to turn them in, that they can trust each other, that they can count on each other, and that's what the gang evidence does."

During trial, Los Angeles Police Department Officer Alex Alas testified as the prosecution's expert on criminal street gangs.  He explained that for the last several years he had been assigned to monitor the Rollin' 60s criminal street gang and assist detectives in investigating crimes involving members of that gang.  He described for the jury the Rollin' 60s history, size, signs and symbols, customs, and primary criminal activities— which included "selling drugs to make money, burglaries, specifically knock-knock burglaries, robberies, carjackings, walk-up or drive-by shootings, and murders."  Among the gang's

8

customs were ostentatious displays of wealth, such as driving expensive automobiles; the custom was so prevalent that members referred to themselves as "Rich Rollin'." Based on their tattoos, photographs found on their cell phones, text messages, and social media posts, Officer Alas opined defendant and Kirkpatrick were both members of the Rollin' 60s.[4]

To establish the predicate pattern of gang crimes that must be proven to find the criminal street gang enhancement true, Officer Alas testified about crimes committed by two members of the Rollin' 60s other than defendant and Kirkpatrick. His testimony on the predicate crimes was based on certified court records and his personal contacts with the two convicted gang members.

Toward the end of Officer Alas's direct examination, the prosecution asked him to offer an opinion on a hypothetical scenario designed to track the facts of Vidaurry's murder. Officer Alas opined the hypothetical crime would benefit the Rollin' 60s because a murder in public "instills fear and intimidation within the community" and demonstrates to rival gangs "how dangerous [the Rollin' 60s] are that they are willing to kill for monetary value . . . ." In addition to the reputational benefits of a murder-

---

[4] Although Officer Alas never had any contact with defendant prior to his arrest for Vidaurry's murder, an officer who did have personal contact with defendant testified defendant admitted in 2010 he was a member of the Rollin' 60s. Another officer testified that in connection with an arrest of defendant in 2008 he observed multiple Rollin' 60s tattoos on defendant's body. Officer Alas conceded on cross-examination that evidence showing defendant had two tattoos removed could indicate he wanted to get out of gang life.

9

for-hire killing, such a crime would also benefit the gang because "they get money out of it." Officer Alas further opined the crime was committed at the direction of the gang because the older gang member, the one with the "higher stature" within the gang, directed the younger member to complete the task.

On cross-examination, Officer Alas clarified that even if no one outside of the gang knew that defendants committed the murder-for-hire, it still benefitted the gang internally because it upheld the gang's reputation of being dangerous. He also acknowledged that during the commission of the crime there were no indications the crime was committed by the Rollin' 60s (e.g., Kirkpatrick did not shout out the gang's name when he shot Vidaurry), the crime was not committed in territory claimed by the Rollin' 60s, and the victim had no known gang ties. Finally, Officer Alas admitted he did not have any personal knowledge of the Rollin' 60s committing any prior murder-for-hire crimes.

At the conclusion of the prosecution's case-in-chief, defendant moved to dismiss the gang allegation for insufficient evidence. The trial court denied the motion: "[T]he only connection between the two defendants that the evidence shows is that they were both members of the same gang. So the strong inference is that this whole activity is gang-related because they weren't boyhood friends or schoolmates ......... And the evidence that these gang members were going to be promoting the gang as a murder for hire operation is very strong."

During the defense case-in-chief, Kimi Lent, a gang intervention specialist, testified as the defense's gang expert. She opined defendant was not an active member of the Rollin' 60s at the time of Vidaurry's murder because (among other things) he was not in the police's gang files, not subject to a gang injunction,

10

and did not live inside the gang's territory. In addition, Ms. Lent opined Vidaurry's murder was not committed for the benefit of the Rollin' 60s because in her 20 years of working with gangs she had never heard of the Rollin' 60s or any other gang engaging in murder-for-hire. She characterized Vidaurry's murder as a "personal crime," not a gang crime.

After the presentation of evidence at trial, the court instructed the jury that defendant was prosecuted for murder under two theories: "one, the murder was willful, deliberate, and premeditated, and, two, the murder was committed by lying in wait." In connection with the first theory, the court, using CALCRIM Nos. 400, 401, 520, 521, and 702, instructed the jury on aiding and abetting and explained that to find defendant guilty of first degree murder as an aider and abettor, the prosecution "must prove that [ ] defendant acted with the intent to kill." Using CALCRIM No. 720, the court instructed the jury further that to find true the special circumstance allegation of murder for financial gain, the prosecution must also prove defendant "intended to kill." On the lying in wait theory, the court, using CALCRIM No. 728, instructed the jury the prosecution was required to prove the following: "The defendant murdered by lying in wait if: [¶] 1. He concealed his purpose from the person killed; [¶] 2. He waited and watched for an opportunity to act; [¶] 3. Then, from a position of advantage, he intended to and did make a surprise attack on the person killed; and [¶] 4. He intended to kill the person by taking the person by surprise."

11

*D.    Verdict, Post-Trial Motions, and Sentencing*

The jury found defendant guilty of first degree murder. The jury found the murder for financial gain special circumstance allegation true but found the lying in wait special circumstance allegation not true. The jury found true the gang enhancement and firearm allegations.

Defendant moved for a new trial. Relying in part on then-recently enacted legislation, Senate Bill No. 1437 (2017-2018 Reg. Sess.) (SB 1437) and Assembly Bill No. 333 (2021-2022 Reg. Sess.) (AB 333), defendant argued his murder conviction was infirm because there was insufficient evidence he had the intent to kill and the trial court erred when it denied his motion to bifurcate the gang enhancement allegation, which he relatedly contended was not supported by sufficient evidence anyway.

The trial court denied defendant's motion and, in so doing, opined the evidence in support of the charges was "overwhelming." As to the bifurcation issue, the court found the gang evidence was appropriately admitted at trial without bifurcation to show motive and intent, as well as a link between the two defendants, even if the evidence was insufficient proof of the gang allegations under the recently enacted AB 333.

The court sentenced defendant to life in prison without the possibility for parole. At the request of the prosecution, the court stayed imposition of the gang and firearm enhancements.

## II.  DISCUSSION

Substantial evidence supports defendant's murder conviction and the jury's true finding on the financial gain special circumstance. The jury could reasonably find beyond a reasonable doubt, based on the evidence at trial, that defendant

and Kirkpatrick plotted the crime for weeks and settled on a plan to kill the intended victim in the expectation of financial gain. The gang enhancement, though stayed, must be reversed, however. The provisions of AB 333 governing proof of gang relatedness apply retroactively and require an organizational nexus between the gang and the predicate crimes committed by its members. No proof of that was introduced here.

Defendant's remaining contentions are meritless. Section 1109, a provision mandating bifurcation of gang allegations upon request that was enacted as part of AB 333, does not apply retroactively to defendant under recent Supreme Court authority. The trial court also did not err when it denied defendant's bifurcation motion on the law as it existed at the time of defendant's trial because the gang evidence established motive and the relationship between the defendants and because the non-motive-related gang evidence (predicate crimes by the other members of the Rollin' 60s and some testimony about the gang generally) was so limited and relatively insignificant as to be nonprejudicial. Finally, defendant's argument that the instructions on the lying in wait theory allowed the jury to convict him on a now improper theory of imputed malice fails for multiple reasons, factual and legal.[5]

[5] Defendant's appellate briefing can be read to suggest the trial court erred in admitting evidence of defendant's prior bad acts of weapons possession. We decline to consider the suggestion an argument meriting resolution because it is inadequately presented (and likely forfeited regardless). (*Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179; Cal. Rules of Court, rule 8.204(a)(1)(B) &(C).)

13

*A.     Substantial Evidence Supports Defendant's Murder Conviction and the Financial Gain Special Circumstance*

Defendant challenges the sufficiency of the evidence to support the jury's verdict on the murder charge and its true finding on the murder for financial gain special circumstance. We assess the arguments using the familiar substantial evidence standard of review.  (*People v. Westerfield* (2019) 6 Cal.5th 632, 713; *People v. Williams* (2015) 61 Cal.4th 1244, 1281.)

*1.     Murder conviction*

"Murder is the unlawful killing of a human being . . . with malice aforethought."  (§ 187, subd. (a).)  Malice may be express or implied.  Malice is express when there is intent to kill.  (§ 188, subd. (a)(1).)  If the murder is "willful, deliberate, and premeditated," it is first degree murder.  (§ 189, subd. (a); *People v. Brooks* (2017) 3 Cal.5th 1, 58.)  ""In this context, 'premeditate' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.'"  [Citation.]  ""An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.""  [Citations.]  "'The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .'"  [Citation.]  Such reflection may be revealed by planning activity, motive, and the manner of the killings, among

14

other things. [Citations.]" (*People v. Potts* (2019) 6 Cal.5th 1012, 1027.)

For a person to be liable as a direct aider and abettor of malice murder, the prosecution must prove the "defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*In re Lopez* (2023) 14 Cal.5th 562, 579.) When an aider or abettor, with his or her own mens rea of premeditation and deliberation, knowingly and intentionally assists a confederate to kill someone, the aider and abettor is guilty of first degree premeditated murder. (*Ibid.*) "Critical" to aiding and abetting liability for express malice murder "is not only an intent to kill but knowledge and intent regarding the direct perpetrator's homicidal or life-endangering acts." (*People v. Curiel* (2023) 15 Cal.5th 433, 469.)

Adequate evidence permitted the jury to find beyond a reasonable doubt that defendant willfully, deliberately, and with premeditation aided and abetted the murder of Vidaurry. Defendant put the murder-for-hire plot in motion by soliciting Kirkpatrick's participation via text message: "a [s]ituation came up and some money was attached to it [and] I figured I[']d run it by you." Once he secured Kirkpatrick's agreement, defendant took a number of affirmative steps in support of the crime, including acquiring a prepaid phone and police scanner, conducting reconnaissance of the intended victim's comings and goings from the body shop, transporting Kirkpatrick to his apartment prior to the murder, and using his apartment as a safe house immediately following the murder. In addition, the jurors could reasonably conclude from the evidence that after picking up

15

Kirkpatrick in San Bernardino and returning to defendant's apartment in San Pedro, defendant took Kirkpatrick back out under the cover of night to show him the path to take to the body shop and the escape route back to the apartment. Moreover, jurors could also reasonably conclude that after Kirkpatrick returned to the apartment following the murder, defendant immediately went down to the building's lobby area to monitor police activity in the wake of the murder and returned to his apartment only after he texted Kirkpatrick "It looks like it is clearing up."

In view of defendant's direction to Kirkpatrick early in their planning that the latter should "d[o] w[ha]t [yo]u g[o]t t[o]," the jurors could also rationally determine that from the start defendant supported commission of the crime to the point of murder.[6] The jury also had evidence from which it could infer that as the criminal plot developed, defendant and Kirkpatrick both had a preconceived design to kill. There was the manner of

---

[6]     Defendant proceeds on the understanding that the relevant text ("[H]e just want y[o]u t[o] p[o]p him below da waist a few times but [yo]u d[o] w[ha]t [yo]u g[o]t t[o]") means the intention must have been only to wound the victim. That is wrong for multiple reasons. First, the jury could infer defendant was providing instructions different from those that he received; "he" wants only a few shots below the waist, but you kill him (do what you got to do) so as not to leave a witness. Second, even accepting defendant's understanding of the text's meaning, that understanding does not mean the plan could not have changed, in the days that followed, to a plan to kill. Third, there is no reason to suppose that inflicting multiple gunshots below the waist is necessarily inconsistent with an intent to kill.

16

killing itself: Kirkpatrick approached Viduarry from his blind side as he exited his vehicle and fired the gun point-blank into his head (not the lower part of his body). There were also defendant's actions in the aftermath of the crime that revealed no surprise or unwillingness to assist Kirkpatrick after what defendant must have known by that point was a murder: shortly after Kirkpatrick returned, defendant escorted Kirkpatrick back upstairs to his apartment before he descended to both the building's street front and lobby area where he monitored police activity in the neighborhood and kept Kirkpatrick apprised of how things were going. Additionally, there was the evidence of defendant's post-crime purchases, which serves as some additional confirmation that he shared the murderous intent of the crime's actual perpetrator.

### 2. *Special circumstance finding*

"'Under section 190.2, subdivision (a)(1), a defendant is subject to the special circumstance if the "murder was intentional and carried out for financial gain."' [Citation.] The financial gain does not need to be the ""dominant,' 'substantial,' or 'significant' motive for the murder."" [Citations.] Nor does a defendant need to realize any 'pecuniary benefit from the murder' for the special circumstance to apply. [Citation.] ""[T]he relevant inquiry is whether the defendant committed the murder in the expectation that he would thereby obtain the desired financial gain.""" [Citation.]" (*People v. Parker* (2022) 13 Cal.5th 1, 63.)

Defendant appears to challenge the jury's special circumstance finding only to the extent that his challenge to the murder conviction itself is successful—and, as we have seen, it is not. But even if we were to understand the challenge more

17

broadly, there is sufficient evidence to support the finding that defendant aided and abetted the murder in the expectation that he would receive a financial gain. Most obviously, there were the texts between defendant and Kirkpatrick that revealed the crime was being committed for money being provided not by defendant but from some unspecified third-party. Defendant devoted significant time, energy, and resources to the crime. He spent days surveilling the body shop and learning its owner's routines (e.g., when Kennedy usually arrived to open the shop in the morning and what vehicle he drove so that Kirkpatrick would be able to identify him as the target instantly). Defendant spent hours driving out to San Bernardino and back to make sure Kirkpatrick was in position to carry out the murder. He purchased an unregistered, prepaid cell phone and carried it with him in addition to his registered phone in an attempt to communicate securely with Kirkpatrick; defendant also acquired a police scanner. There is no reason to suppose all of this work was undertaken with no expectation of sharing in the monetary reward. Finally, in the days immediately preceding the murder, defendant located a luxury automobile he wished to purchase and purchased the vehicle less than a week after the murder.

  *B. Reversal of the Gang Enhancement and Gang-Related Firearm Finding Is Required*

  "'In 1988, the Legislature enacted the California Street Terrorism Enforcement and Prevention Act (STEP Act; § 186.20 et seq.) to eradicate "criminal activity by street gangs." [Citation.] Among other things, the STEP Act created 'a sentencing enhancement for a felony committed "for the benefit of, at the direction of, or in association with any criminal street

18

gang" [citation].' [Citation.]" (*People v. Tran* (2022) 13 Cal.5th 1169, 1205-1206.)

In 2016, at the time of defendant's trial, section 186.22 defined "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (Former § 186.22, subd. (f).) With regard to a "pattern of criminal gang activity," the prosecution at the time of defendant's trial had to prove only that those associated with the Rollin' 60s had committed at least two offenses from a list of predicate crimes on separate occasions within three years of one another. (Former § 186.22, subd. (e) [defining "pattern of criminal activity" as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons"].)

As our Supreme Court has recently observed, the Legislature "substantially amended the STEP Act in [AB 333]." (*People v. Clark* (2024) 15 Cal.5th 743, 752.) "'First, it narrowed the definition of a "criminal street gang" to require that any gang be an "ongoing, *organized* association or group of three or more persons." (§ 186.22, subd. (f), italics added.) Second, whereas

19

section 186.22, former subdivision (f) required only that a gang's members "individually or collectively engage in" a pattern of criminal activity in order to constitute a "criminal street gang," [AB 333] requires that any such pattern have been "*collectively* engage[d] in" by members of the gang. (§ 186.22, subd. (f), italics added.)  Third, [AB 333] also narrowed the definition of a "pattern of criminal activity" by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang "members," as opposed to just "persons"; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. (§ 186.22, subd. (e)(1), (2).)  Fourth, [AB 333] narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any "common benefit" be "more than reputational." (§ 186.22, subd. (g).)' [Citation.]" (*Clark*, *supra*, at 752-753.)

In *Clark*, our highest court held the Legislature's reference to collective engagement in a pattern of criminal activity "calls for an inquiry not just into how the predicate offenses benefited the gang, but also how the gang works together as a gang.  It calls for a showing of a connection, or nexus, between an offense committed by one or more gang members and the organization as a whole." (*Clark*, *supra*, 15 Cal.5th at 762.) An organizational nexus "may be shown by evidence linking the predicate offenses to the gang's organizational structure, meaning its manner of governance; its primary activities; or its common goals and principles. By reference to these elements of a gang's affairs and operations, we do not mean to overstate the degree of formality

20

required. As we have recognized, some gangs have a "'loose'" structure [citation], while others are 'highly ordered and disciplined,' with a 'well-defined' hierarchy [citation]. Similarly, some gangs may have loosely defined goals and principles, while others may have clearly defined missions. Given this variability, collective engagement will be established in different ways."[7] (*Ibid*.)

Defendant argues AB 333's amendments to section 186.22 apply retroactively under the rule of *In re Estrada* (1965) 63 Cal.2d 740. That is correct. (See, e.g., *Tran*, *supra*, 13 Cal.5th at 1206-1207 ["the Attorney General concedes that the rule of *In re Estrada* . . . applies [to AB 333], and we agree ........[AB 333's] changes have the effect of 'increas[ing] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement,' with obvious benefit to defendants"]; accord, *People v. Rojas* (2023) 15 Cal.5th 561, 567.) He also argues that, applied retroactively, the evidence supporting the true finding on the section 186.22, subdivision (b)(1) gang enhancement was insufficient. That is correct too.

---

[7] *Clark* offered a number of examples of how collective engagement might be established: "[T]here might be evidence of a direct order from the gang to commit specific crimes. [Citations.] Alternatively, evidence might show a more general, well-understood expectation that members must engage in certain types of offenses. [Citation.] In other cases, collective engagement might be shown by demonstrating that the offenses are reflective of the primary activities of the gang, or else adhere to a common goal or plan characteristic of the gang in question. [Citations.]" (*Clark*, *supra*, 15 Cal.5th at 762.)

21

Officer Alas, the prosecution's gang expert, testified about the Rollin' 60s' history, territory, size, allies, rivals, signs, symbols, and primary criminal activities. He did not (understandably, given the intervening change in the law) offer any testimony about the gang's organizational structure or how the gang's members collectively engaged in criminal activity generally or in specific connection with the two predicate crimes. In view of the absence of any evidence about the Rollin' 60s' organization and the organizational nexus between the gang and the predicate crimes committed by its members, the true finding on the section 186.22 gang allegation must be reversed (not just stayed, as it is at present). Because the evidence is insufficient to support the gang enhancement, the gang-related firearm enhancements are also infirm and must be similarly reversed. (*People v. Cooper* (2023) 14 Cal.5th 735, 745-747.)

> C. *Section 1109 Does Not Apply Retroactively and the Trial Court Did Not Err In Denying Defendant's Motion to Bifurcate Trial Under the Law As It Existed at the Time of Trial*

In addition to making changes to section 186.22, AB 333 added section 1109 to the Penal Code. Section 1109 provides that, "if requested by the defense, a trial court must try a gang enhancement charge separately from the underlying offense. (§ 1109, subd. (a); Stats. 2021, ch. 699, § 5.) The statute likewise provides that gang-participation offenses must be tried separately from all other counts that do not require gang evidence as an element of the crime. (§ 1109, subd. (b); Stats. 2021, ch. 699, § 5.)" (*People v. Burgos* (2024) 16 Cal.5th 1, 7.)

22

Relying on the principles of *Estrada, supra*, 63 Cal.3d 740, defendant contends section 1109 applies retroactively. Our Supreme Court has recently held otherwise, and that ends the matter. (*Burgos, supra*, 16 Cal.5th at 8 ["We conclude that the *Estrada* inference of retroactivity does not extend to section 1109"].)

Defendant also argues, however, that the trial court erred in denying his motion to bifurcate trial of the gang enhancements even on the law as it existed before enactment of section 1109. As we next explain, that is incorrect.

"[E]vidence of gang membership is often relevant to, and admissible regarding the charged offense. Evidence of the defendant's gang affiliation . . . can help prove identity, motive, modus operendi, specific intent, means of applying force or fear, or other issues pertinent to the guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049; *People v. Montes* (2014) 58 Cal.4th 809, 859 ["While gang membership evidence does create a risk the jury will impermissibly infer a defendant has a criminal disposition and is therefore guilty of the offense charged [citation], 'nothing bars evidence of gang affiliation that is directly relevant to a material issue'"].)

Cross-admissibility is not the only criterion affecting bifurcation. As our Supreme Court has explained: "Even if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself—for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged—a court may still deny bifurcation. In the context of severing charged offenses, [our Supreme Court has] explained that 'additional factors favor joinder. Trial of the counts together

23

ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials.' [Citation.]" (*Hernandez, supra*, 33 Cal.4th at 1050.) Bifurcation is appropriate, by contrast, when the gang evidence is minimally probative and so inflammatory it threatens to sway the jury to convict without regard to actual guilt. (*Id.* at 1051.)

"We review the court's order denying the motion for a new trial de novo. [Citation.] Nonetheless, the decision on whether evidence, including gang evidence, is relevant, not unduly prejudicial and thus admissible, rests within the discretion of the trial court. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court ........[i]t is appellant's burden on appeal to establish an abuse of discretion and prejudice." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 224-225, internal quotation marks omitted.)

Here, the trial court did not abuse its discretion in denying defendant's motion to bifurcate. Contrary to defendant's contention, the gang evidence was material and relevant to the prosecution's theory of first degree murder. As the trial court observed, evidence of membership in the Rollin' 60s was relevant to showing how and why defendant and Kirkpatrick, men who were not contemporaries, did not grow up together, and did not live near one another, came to plan and commit a brazen, daylight murder-for-hire. In addition, Officer Alas's testimony that members of the Rollin' 60s drove luxury automobiles and referred to themselves as "Rich Rollin'" was relevant to establishing motive for the murder and proving the murder for hire special circumstance—especially in view of the purchase of Cadillac sedans by both men shortly after the murder. (See, e.g.,

24

*Montes*, *supra*, 58 Cal.4th at 859 [gang affiliation evidence appropriately admitted because it "was relevant to show the codefendants' relationship with each other........ [and] also served to explain defendant's motive for committing the crimes, particularly the murder"].) The gang evidence admitted that may not have been relevant to the charged crimes (e.g., evidence of predicate crimes committed by other members of the Rollin' 60s) was not so inflammatory as to sway the jury, which was presented with compelling evidence of defendant's guilt independent of any gang evidence. (*People v. E.H.* (2022) 75 Cal.App.5th 467, 480 [because there was "strong" evidence defendant committed the charged robberies, "we conclude that the jury's verdict was based on the evidence, not improper bias, and that bifurcation would not have helped E.H."]; see also *Tran*, *supra*, 13 Cal.5th 1169, 1208-1209; *Hernandez*, *supra*, 33 Cal.4th at 1051 ["Any evidence admitted solely to prove the gang enhancement was not so minimally probative on the charged offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of defendants' actual guilt"].)

> D.    *Reversal for Instructional Error Is Not Required Because Defendant Was Not Convicted on a Theory of Imputed Malice*

Defendant maintains reversal is required because the jury was instructed on murder by lying in wait in such a way as to allow the jury to convict him of murder on a theory of imputed

25

malice that is no longer valid following the passage of SB 1437.[8] The argument suffers from multiple flaws, both record-based and legal.

First, the trial court instructed the jury with CALCRIM No. 728 in connection with the lying in wait allegation. That instruction informed the jury that to convict defendant of that crime it needed to find he "intended to kill." There is therefore no possibility that the jury could have interpreted the lying in wait instructions to dispense with the need to prove malice. (*People v. Cortez* (1998) 18 Cal.4th 1223, 1228 [express malice is an unlawful intent to kill].)

Second, although lying in wait murder was one of the two express theories of murder liability upon which the jury was instructed, defendant was not convicted on that theory. The jury found the lying in wait allegation "false." Instead, defendant was convicted of willful, deliberate, and premeditated murder. To be found guilty of that crime, the jury was repeatedly instructed that it had to find that defendant acted with the intent to kill.

Third, and finally, insofar as defendant contends there was ambiguity in the lying in wait instructions that somehow bled into the jury's consideration of murder liability pursuant to the instructions on that topic, defendant's contention runs contrary to basic settled law. "We presume the jury understood and followed the instructions it was given." (*People v. Holt* (1997) 15 Cal.4th

---

[8]     The purpose of SB 1437 was to limit murder convictions to instances where a defendant personally harbors malice—a mens rea element. (§ 189, subd. (e).) "Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

26

619, 662; accord, *People v. Martinez* (2010) 47 Cal.4th 911, 957; *People v. Flores* (2020) 9 Cal.5th 371, 405.)

## DISPOSITION

The true findings on the section 186.22, subdivision (b) gang enhancement allegation, and the section 12022.53, subdivision (e) firearm enhancement allegation are reversed.  In all other respects, the judgment is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, Acting P. J.

We concur:



MOOR, J.



DAVIS, J.[*]




[*]	Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.